**CHOICE HOTELS INTERNATIONAL, INC., Plaintiff,**

v.

**PENNAVE ASSOCIATES, et al., Defendants.**

No. Civ.A. 98–4111.

United States District Court, E.D. Pennsylvania.

Feb. 12, 2001.

Cecelia L. Fanelli, James K. Brengle, Duane, Morris & Heckscher LLP, Philadelphia, PA, for Choice Hotels International, Inc., Plaintiff.

Francis Recchuiti, Vangrossi and Recchuiti,* Norristown, PA, Douglas R. Blazey, Elliott, Reihner, Siedzikowsky, and Egan, P.C., Blue Bell, PA, for Pennave Associates, Inc., Defendant.

## *FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT*

SCHILLER, District Judge.

On August 6, 1998, Plaintiff Choice Hotels International, Inc. ("Choice Hotels") brought this action against Defendants Pennave Associates, Inc. ("Pennave") and David S. Miller alleging trademark infringement, unfair competition, false designation and description, and misappropriation of advertising ideas or style of doing business under federal and state law. Plaintiff seeks injunctive relief as well as the Defendants' profits, damages to accomplish corrective advertising, and attorneys' fees and costs. On October 13, 2000, this Court entered a default judgment against Pennave in the amount of $389,736.84. After a trial on the merits and consideration of memoranda filed by both parties on the issues of damages, I enter judgment in favor of Plaintiff and against Defendant Miller.

## I. FINDINGS OF FACT

### A. BACKGROUND

1. Choice Hotels International, Inc. has been and is now extensively engaged in the business of the sale and marketing in interstate commerce of a wide variety of hotels and other services.

2. Since 1965, Choice Hotels and its predecessors in interest have operated and franchised hotels under a group of service marks, trademarks and trade names (the "Marks"). Said Marks have been widely advertised and services have been extensively offered under the Marks throughout the United States. The Marks have become, through widespread and favorable public acceptance and recognition, an asset of substantial value as a symbol of Choice Hotels, its quality products and its goodwill.

3. Choice Hotels owns and uses the Clarion mark, among others, which is registered on the Principal Register of the United States Patent and Trademark Office for hotel and motel services.

4. On or about October 31, 1996, Choice Hotels and Pennave entered into a franchise agreement and addendum (the "Franchise Agreement") regarding a hotel ("Hotel") located in Fort Washington, Pennsylvania. Mr. Miller executed the Franchise Agreement on behalf of Pennave as both President and Secretary.

5. Mr. Miller is the sole shareholder in Pennave. At the time that Mr. Miller signed the Franchise Agreement, he was the only officer of Pennave. Pennave had no board of directors. At the time of the execution of the Franchise Agreement, no one other than Mr. Miller had the authority to bind Pennave financially with respect to any agreements that Pennave might enter into. Mr. Miller, as President of Pennave, had the

authority to sign the Addendum to the Franchise Agreement.

6. Mr. Miller owned the Hotel and controlled its finances at all relevant times during the period of infringement.

7. The Hotel was required to meet certain standards before it would be permitted to display Clarion Marks. Pursuant to the express terms of the Franchise Agreement, Mr. Miller agreed to upgrade the Hotel to Clarion standards before using the Clarion Mark. In the Addendum, Pennave specifically agreed to make certain upgrades to the Hotel or to cure existing deficiencies in accordance with Clarion Hotels' Rules and Regulations. Subsections (a) through (1) of paragraph 1 set forth in detail the required changes and additions which paragraph 1 specifically states *"will be completed to Franchisor's satisfaction no later than January 1, 1997"* (emphasis in original).

8. Further, in Paragraph 1 of the Addendum, Pennave specifically agreed that it could not use the Clarion Marks unless the work was completed and written authorization was obtained from Choice Hotels. Paragraph 1 provides in relevant part that Franchisee "acknowledges that it is not authorized to use Clarion Hotel's marks prior to completion of such changes and additions and receipt of written authorization from Franchisor that such changes and additions have been completed to Franchisor's satisfaction ..."

9. In a letter dated November 7, 1996, Richard P. Kaden, Senior Vice President—Brands, wrote to Mr. Miller and pointed out specific Choice Hotels requirements, "To avoid any misunderstanding ..." Kaden reiterated the need for Mr. Miller to obtain prior written approval from Choice Hotels to use its marks on a variety of items, including stationery. (Pl.Exh. 4).

10. The repairs and renovations set forth in the Addendum were not completed by January 1, 1997. In fact, those repairs and renovations remained incomplete as of January 2, 2001.

11. Choice Hotels never issued a written authorization to Pennave or Mr. Miller indicating that they could begin using the Marks.

## B. Infringement

1. Despite the fact that the repair and renovation items set forth on the Addendum were not complete and no written authorization was obtained from the Franchisor, Mr. Miller began to use Choice's Marks and failed to make any payments to Choice for such use.

2. Beginning sometime before July of 1997, Mr. Miller used the Clarion Mark on a banner, a billboard, stationery, mailing envelopes, business cards, and in newspaper classifieds. (Pl.Exhs.14, 15, 17, 18, 19, 25, 26, 30, 38). In addition, the phones at the Hotel were being answered "Clarion Hotel."

3. Prior to filing this matter, several letters were written to David Miller and his attorney Mitchell W. Miller, who is also David's father, on behalf of Choice Hotels requesting that he cease and desist from his unlawful conduct. (Pl.Exhs.3, 4, 5, 6.7).

4. The unauthorized use of the Clarion Mark continued.

5. On July 16, 1997, Choice Hotel's in-house counsel wrote to David Miller

regarding his "Unauthorized Service Mark Use." That letter demanded that Mr. Miller remove or cover all Clarion hotel marks and "cease to identify yourself in any other way to the public as a Clarion Hotel." (Pl. Exh. 7). Mr. Miller continued to use the marks in violation of the express terms of the Franchise Agreement.

6. On January 7, 1998, Choice Hotels issued a Notice of Default to David Miller. (Pl.Exh. 6). The Notice of Default expressly referenced Mr. Miller's "unauthorized use of the proprietary marks owned by Choice" and stated as follows:

In addition, it has come to our attention that you are displaying a "Clarion Coming Soon" banner and are answering the phone at your property "Clarion Hotel." Your unauthorized use of the proprietary marks owned by Choice, including, but not limited to, the trade name and service mark CLARION HOTEL® and the CLARION HOTEL and Design® marks, must cease immediately. Pursuant to paragraph 1 of the Addendum to the Franchise Agreement, Franchisee is not unauthorized to use our proprietary marks until Choice gives it written authorization to do so. Continued use of our proprietary marks will constitute trademark infringement and may subject you to damages under the Franchise Agreement and the Lanham Trademark Act of 1946. Should you fail to discontinue any and all use of our proprietary marks immediately, we shall seek injunctive relief and damages arising out of your unauthorized use of our marks.

7. Mr. Miller's of the Clarion mark continued.

8. On February 9, 1998, Choice Hotels sent a letter to Mitchell W. Miller, noting that David Miller was displaying the Clarion mark on a billboard "near the bridge from New Jersey onto the Pennsylvania Turnpike." Choice Hotels demanded that this unlawful behavior cease by February 25, 1998.

9. Mr. Miller continued to use the Clarion mark.

10. Choice Hotels again wrote to Mitchell W. Miller on June 11, 1998, noting that "we have provided ample warning and opportunity to cure ..." (Pl.Exh. 7). The June 11, 1998 letter demanded that the unlawful infringement cease.

11. Mr. Miller continued to the use of the Clarion mark.

12. On July 20, 1998, Choice Hotels issued a Notice of Termination to David Miller. (Pl.Exh. 10). Even after termination, David Miller continued to use the Clarion mark.

13. Section 12(a) of the Franchise Agreement expressly provides as follows:

(a) Upon termination of this Agreement for any reason whatsoever, Franchisee shall, at its expense, immediately discontinue any and all use of the Proprietary Marks, or anything similar thereto in connection with the Hotel and shall thereafter refrain from identifying the Hotel as a CLARION HOTEL or former CLARION HOTEL.

14. Section 12(b) of the Franchise Agreement also further required that:

(b) Franchisee shall take such action as may be necessary to cancel any assumed name of equivalent registration which contains the marks or any variation thereof or anything similar thereto, or any other Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor for compliance

with this obligation within 30 days after termination or expiration of the Agreement or suspension of services.

15. Section 12(e) of the Franchise Agreement requires the Franchisee upon termination to immediately turn over all materials bearing the Choice mark. Section 12(e) provides as follows:

(e) Franchisee shall immediately turn over to Franchisor all manuals, records, files, instructions, correspondence and all other materials provided by Franchisor related to constructing and operating the Hotel, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement and of any correspondence between the parties, and of any other documents which Franchisee reasonably needs for compliance with any provision of law.

16. With respect to the issue of approvals and waivers, Section 20 of the Franchise Agreement provides that "approvals and consents by Franchisor shall not be effective unless signed by an officer of Franchisor. Franchisor's consent, wherever required, may be withheld if any default by Franchisee exists under this Agreement."

17. Section 20 of the Franchise Agreement makes clear that the only representations and warranties of the Franchisor are those expressly contained in the Franchise Agreement. Section 20(b) provides as follows:

(b) Except as may otherwise be set forth in the Agreement, Franchisor makes no warranties or guarantees upon which Franchisee may rely. Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any delay or denial of any request therefor.

18. Section 21 of the Franchise Agreement mandates that the terms of the Franchise Agreement supersede all other written or oral representations. Sections 21(i) and (j) expressly provide as follows:

(i) This Agreement contains the agreement of the parties and supersedes any previous written or oral agreement and no representation, inducement, promise or agreement, oral or otherwise, not embodied herein, shall be of any force or effect.

(j) This Agreement may not be amended except by an agreement in writing signed by the parties hereto.

19. Section 22 of the Franchise Agreement, which is captioned "Acknowledgments," contains the following provision in subsection (a): " ... by its execution hereof, Franchisee represents to the Franchisor that it has neither received nor relied on representations at any time concerning or relating to the Franchise offering, except as may be expressly set forth in writing in this Agreement."

20. As a result of Mr. Miller's infringing activities, numerous contractors and suppliers filed suit not only against Mr. Miller and his corporations, but "Clarion" as well. *See Engineered Air Inc. v. David Miller, Pennave Associates, Inc. and Clarion Hotel,* filed in June 10, 1997, and *J.T. Murphy Company, Inc. v. Pennave Associates, Inc. t/a Days Hotels and Clarion Hotels* filed on September 3, 1997.

21. Despite Choice's repeated requests to Mr. Miller that he stop infring-

ing the Clarion Mark, he continued to use the Clarion Mark even as Clarion became a defendant in lawsuits resulting from Mr. Miller's non-payment of bills relating to the Hotel.

22. In fact, a default judgment was entered against "Clarion Hotel" on July 21, 1997 in the *Engineered Air* litigation.

### C. Proceedings before this Court

1. On August 19, 1998, the Court entered an Order granting Choice Hotels a Temporary Restraining Order directing Mr. Miller to remove the Clarion marks at the hotel within seven business days.

2. Through its continued investigation, Choice Hotels discovered that Mr. Miller continued to use the Clarion mark. On September 9, 1998, this Court ordered Mr. Miller to take down the authorized Clarion sign at the Hotel by the following night, after holding a conference with the parties.

3. On October 13, 2000, this Court entered a default judgment against Pennave pursuant to Federal Rule of Civil Procedure 55(b)(1).

4. At trial, the Court accepted into evidence two 1997 financial statements for the Hotel prepared by David Miller. The first, entitled "Clarion Hotel—Fort Washington 1997 Statement of Operations" was enclosed with a February 12, 1998 letter signed by Mr. Miller, written on "Clarion Hotel" stationary, to Del-Val Financial for the purpose of providing "clarification regarding changes in my mortgage loan." (Pl. Exh. 36). A 5.9% profit of $31,921.00 shown. (Pl.Exh. 36). The second accounting, captioned "Hotel Fort Washington 1997 State-

ment of Operations," was sent to attorneys for Choice Hotels on November 23, 1998. (Pl.Exh. 37). It reflects a 46.4% loss of $252,497.00. Also included was "Hotel Fort Washington 1998 Statement of Operations as of 11/15/98," which showed a 32.6% loss of $112,127.00. (Pl.Exh. 37).

## II. CONCLUSIONS OF LAW

1. Mr. Miller's use of the Clarion mark in commerce without the consent of Choice Hotels in connection with the sale of services violates 15 U.S.C. § 1114.

2. Mr. Miller's use of the Clarion mark in commerce in connection with services is likely to deceive as to the connection of the Hotel with Choice Hotels in violation of 15 U.S.C. § 1125(a).

3. Mr. Miller is individually liable for his acts of infringement. *See Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 605–06 (3d Cir.1978); *Metromedia Steakhouses Co., L.P. v. Resco Mgmt., Inc.*, 168 B.R. 483, 486 (D.N.H.1994) (observing that "[p]ursuant to the plain language of the Lanham Act, any individual may be liable in civil actions for damages" even where the individual is acting in the scope of his employment).

4. No "special or contractual relationship is required" to hold an individual liable for acts of infringement. *Metromedia Steakhouses*, 168 B.R. at 487.

5. Pursuant to 15 U.S.C. § 1117(a), "the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plain-

tiff, and (3) the costs of the action" when a violation of 15 U.S.C. § 1125(a) is established.

6. Pursuant to 15 U.S.C. § 1117(a), "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." Here, Mr. Miller's profits are difficult to determine because Mr. Miller failed to maintain and produce accurate records. The records produced by Mr. Miller vary depending on the purpose for which they are prepared. (Pl.Exh. 36, 37). The only record of profits for the Hotel produced at trial demonstrate that it earned $31,921.00. In assessing damages in this matter, I exercise my discretion because I find that the profits reflected in the records produced by Mr. Miller are inadequate to compensate Plaintiff for Mr. Miller's unlawful conduct. Thus, I award Plaintiff $100,000.00.

7. Pursuant to 15 U.S.C. § 1117(a), "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." An exceptional case is one in which there is culpable conduct, or knowing infringement, on the part of the defendant. *See Securacomm Consulting, Inc. v. Securacom, Inc.*, 224 F.3d 273, 280 (3d Cir.2000) (citing *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir.1991)); *ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1216 (D.Del.1994). Here, the defendant was well aware that his repeated use of the Marks was unlawful. I find that Mr. Miller's conduct constitutes knowing and willful infringement of Plaintiff's Marks. Therefore, this is such an exceptional case warranting the award of attorney fees.

8. Pursuant to 15 U.S.C. § 1117(c), in a case in which the court finds a willful use of a counterfeit mark (copy), as defined by 15 U .S.C. § 1116(d), has been established, the plaintiff may elect to recover statutory damages, of "not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." I find Mr. Miller's use of counterfeit marks to be willful.

9. Plaintiff requests damages pursuant to 15 U.S.C. § 1117(a) and elects statutory damages pursuant to § 1117(c) in the alternative.

### *JUDGMENT*

AND NOW, this 9th day of February, 2001, it is hereby ORDERED as followed:

1. JUDGMENT IS ENTERED in favor of plaintiff Choice Hotels International, Inc. and against defendant David Miller, individually;

2. Defendants Miller and Pennave are PERMANENTLY ENJOINED from:

a. Using the Marks or any confusingly similar designation, alone or in combination with other words, as a trademark, corporate name, trade name component or otherwise, to market, advertise or identify the hotel located at 530 Pennsylvania Avenue in Fort Washington, Pennsylvania or any related products and/or services;

b. Otherwise infringing as of Plaintiff's Marks, including CLARION®, QUALITY®, COMFORT®, SLEEP®, ECONO®, RODEWAY®, CHOICE®, and MAINSTAY® marks or any marks utiliz-

ing these words or any similar words or their attendant designs in any fashion;

c. Unfairly competing with Plaintiff in any manner;

d. Causing the likelihood of confusion, injury to business reputation or dilution of the distinctiveness of Plaintiff's Marks;

3. Defendants Miller and Pennave shall file a sworn affidavit, within ten (10) calendar days of this Judgment, setting forth the manner and form in which he has complied with this Judgment;

4. Defendants Miller and Pennave shall deliver all devices, literature, electronic media, advertising, proprietary computer systems and any other materials bearing Plaintiff's marks to counsel for Plaintiff, within ten (10) calendar days of this Judgment;

5. JUDGMENT IS ENTERED, pursuant to paragraph § 1117(a), in the amount of $100,000.00 in favor of Plaintiff against Defendant Miller, in addition to counsel fees and costs to be determined. Upon payment of any monies as a result of a sheriff's sale or refinancing of the Hotel to Mr. Miller or any entity controlled by Mr. Miller, after first satisfying any already existing liens, Mr. Miller is directed to place in escrow the balance of any proceeds from said sheriff's sale or loan not to exceed 200,000.00 for payment of the judgment in this matter;

6. Plaintiff shall have seven (7) calendar days from the date of this Judgment to submit documentation reflecting its attorney fees and costs and fees. Defendant shall have seven (7) calendar days from the date of Plaintiff's submission to submit any response thereto.

7. Defendant Miller is further enjoined from transferring any assets, indicia of ownership, stock or real estate related to the Hotel located in Fort Washington, Pennsylvania which in any way would defeat the ability of Plaintiff to execute on this judgment.